# EXHIBIT G

```
1              IN THE UNITED STATES DISTRICT COURT
              FOR THE WESTERN DISTRICT OF TEXAS
2                    SAN ANTONIO DIVISION
3    SUSAN SIDEMAN and MARK  )
     SIDEMAN,                )
4                            )
        Plaintiffs,          )
5                            )
     vs.                     ) CIVIL NO. 5:17-CV-00023-OLG
6                            )
     FARMERS GROUP, INC., a  )
7    Nevada Corporation,     )
                             )
8       Defendant.           )
9    ****************************************************
10                     ORAL DEPOSITION OF
11                       SUSAN SIDEMAN
12                      October 27, 2017
13   ****************************************************
14      ORAL DEPOSITION OF SUSAN SIDEMAN, produced as a
15   witness at the instance of the Defendant, and duly
16   sworn, was taken in the above-styled and numbered
17   cause on October 27, 2017, from 9:46 a.m. to
18   10:55 a.m., before WILLIAM M. FREDERICKS, CSR in and
19   for the State of Texas, reported by machine shorthand
20   at the offices of Gravely & Pearson, L.L.P.,
21   425 Soledad, Suite 600, San Antonio, Texas, pursuant
22   to the Federal Rules of Civil Procedure.
23
24
25
                                            Page 1
```

```
 1                  A P P E A R A N C E S
 2   FOR THE PLAINTIFFS:
 3        MR. JOE K. LONGLEY
          Attorney At Law
 4        3305 Northland Drive, Suite 500
          Austin, Texas   78731
 5        512.477.4444
          joe@joelongley.com
 6
 7   FOR THE DEFENDANT:
 8        MR. JAMES HUGHES
          Norton Rose Fulbright US LLP
 9        98 San Jacinto Boulevard, Suite 1100
          Austin, Texas   78701
10        512.474.5201
          james.hughes@nortonrosefulbright.com
11
12   ALSO PRESENT:  Mr. Mark Sideman.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page  2

```
 1                    I N D E X
 2   Appearances...................................... 2
 3   SUSAN SIDEMAN
         Examination by Mr. Hughes................... 4
 4       Examination by Mr. Longley................. 43
 5   Signature and Changes........................... 44
     Reporter's Certificate.......................... 46
 6
 7                  E X H I B I T S
 8   NUMBER        DESCRIPTION                     PAGE
 9   Exhibit 1     Texas Farmers Insurance Company   11
                   document bearing Bates numbers
10                 PL 0058 through PL 0070
11   Exhibit 2     Farmers Insurance Claim Outcome   18
                   Letter dated May 24, 2016, bearing
12                 Bates numbers PL 0071 through
                   PL 0078
13
     Exhibit 3     Letter from Mark Gravely to       20
14                 Farmers Group, Inc., dated
                   January 13, 2017 bearing Bates
15                 numbers FGI000487 and 488
16   Exhibit 4     Texas Department of Insurance     24
                   documents bearing Bates numbers
17                 PL 0136 through PL 0140
18   Exhibit 5     Farmers policy renewal documents  25
                   dated 06-05-2012 bearing Bates
19                 numbers PL 0001 through PL 0017
20   Exhibit 6     Farmers Next Generation Homeowners 26
                   Policy bearing Bates numbers
21                 PL 0019 through PL 0056
22   Exhibit 7     Farmers insurance coverage        37
                   documents bearing Bates numbers
23                 FGI000190 through FGI000209
24
25
```

Page 3

Susan Sideman - October 27, 2017

1      A.    Excellent.

2      Q.    Okay.  Now, this roof was damaged, correct,

3  in a hailstorm, is that right?

4      A.    Right.

5      Q.    And when did that happen?

6      A.    April 2016.

7      Q.    And just describe to me, how did you become

8  aware that it was damaged?

9      A.    Well, we went through a hellacious hailstorm.

10  It was breaking panes in the skylights.  And so we

11  called -- we called a roofing company to come see if

12  we had any damage on it other than the thing, and they

13  told us we had damage.

14      Q.    Did you see water coming into the house when

15  that happened?

16      A.    Not initially.  About a day or two after the

17  storm we started seeing a stain on the ceiling in the

18  dining room, so -- yeah.

19      Q.    And do you know, to the best of your

20  knowledge, where that water was coming from, what

21  caused that water to come in?

22      A.    Yes.  I was told by the roofer who repaired

23  it that the vent that was above the dining room had

24  been knocked by the hail hitting it and it was

25  allowing the water to seep in there, and it bled

Page  8

Susan Sideman - October 27, 2017

1    through to the ceiling.

2         Q.   Do you know if water was entering the house

3    through any other opening other than that one?

4         A.   Yes.  It was coming in in our front foyer

5    where the -- it had broken out a skylight, and it was

6    coming in there.  We had to put pails to catch it.

7         Q.   And any other places?

8         A.   No.

9         Q.   So at some point Farmers sent someone to

10   inspect the damage, is that right?

11        A.   Correct.

12        Q.   And can you describe -- do you recall who

13   that was and when they came?

14        A.   It was Sarah Perry, and she came out on the

15   15th I think.  I'm not sure.  May.  May 15th I think

16   she came to the house.

17        Q.   And what did she do when she arrived?

18        A.   Well, she came with the roofer, and they

19   looked at all the things that we knew were damaged.

20   They looked at the roof, and she assessed the damage.

21        Q.   And did she tell you what she thought the

22   damage was at that time?

23        A.   She -- I'm not sure that she did that.  I

24   can't answer it that she did that at the time.

25        Q.   Did she later give you any kind of listing

Page 9

Susan Sideman - October 27, 2017

```
 1        A.   I don't -- I don't remember.  I probably --
 2    is this what they gave me?
 3        Q.   Well, it was produced to us by your
 4    attorneys, but I don't -- I mean --
 5        A.   Uh-huh.
 6        Q.   -- I'm just asking if you recognize the --
 7        A.   I don't remember it.  I don't pay attention
 8    to these things, this kind of thing here.  So...
 9        Q.   So you've never reviewed this to your
10    recollection?
11        A.   I'm going to have to say no.  Probably, but
12    no.
13        Q.   Okay.  That's fine.
14        A.   What is this?
15             MR. LONGLEY:  No questions.  He gets to
16    ask the questions.
17             THE WITNESS:  Okay.
18             MR. HUGHES:  Yeah, we can all agree on
19    that.
20             MR. LONGLEY:  Yeah, we can.  It will go
21    a lot faster that way.
22             THE WITNESS:  All right.  Sorry.
23             MR. LONGLEY:  That's okay.
24             Would you like some water?
25             (Discussion off the record.)
```

Page 19

Susan Sideman - October 27, 2017

1      A.    I have no idea.

2      Q.    Okay.

3            (Deposition Exhibit 4 marked.)

4            THE REPORTER:  Exhibit 4.

5            (Document tendered.)

6            MR. HUGHES:  I'll hand you a copy.

7            MR. LONGLEY:  Thank you.

8            (Document tendered.)

9      Q.    (BY MR. HUGHES)  Mrs. Sideman, this is

10     Exhibit 4.  This is a document that your attorneys

11     produced to us.

12           Could you turn to the third page, and

13     it's a letter, and could you read the date of the

14     letter.

15     A.    September 29th, 2011.

16     Q.    Okay.  And can you read who the letter is

17     addressed to at the top?

18     A.    To the Honorable Eleanor Kitzman.

19     Q.    Okay.  Of the -- could you read her job title

20     as well, please.

21     A.    Commissioner of Insurance.

22     Q.    With the Texas Department of Insurance?

23     A.    Correct.

24     Q.    Okay.  Have you ever seen this letter before

25     today?

Susan Sideman - October 27, 2017

```
 1        A.    No.
 2        Q.    Okay.  And take a moment to look over it.
 3   Are you sure you've never seen it before?
 4        A.    I don't --
 5        Q.    No?
 6        A.    I don't think I've read this letter before.
 7        Q.    Okay.  That's fine.
 8        A.    Is that good enough?  Okay.
 9        Q.    That's all I need to know.  Thank you.
10              (Deposition Exhibit 5 marked.)
11              THE REPORTER:  Exhibit 5.
12              (Document tendered.)
13        Q.    (BY MR. HUGHES)  Mrs. Sideman, I've handed
14   you Exhibit 5.  Can you look at the first page and
15   just read who this is addressed to.
16        A.    Who it's addressed to?
17        Q.    Yes, please.
18        A.    To Susan Sideman and Mark Sideman.
19        Q.    And what's the date on the top?
20        A.    6/5/12.
21        Q.    Okay.  Do you recall receiving this letter on
22   or about that date?
23        A.    I do not.
24        Q.    And would you mind turning one sheet over.
25   So look at the page that's Bates numbered PL 0003.
```

Page 25

Susan Sideman - October 27, 2017

```
 1        A.    Uh-huh.

 2        Q.    Have you ever seen this page before?

 3        A.    To the best of my knowledge, I have not.

 4        Q.    Okay.  You don't recall this page.

 5              Can you read the top right corner, the

 6   big bold print.

 7        A.    Top right corner.  This (indicating)?

 8        Q.    Yes.

 9        A.    "DECLARATIONS, Homeowners, Replaces all prior

10   Declarations, if any."

11        Q.    Okay.  Do you know what a declarations page

12   is?

13        A.    No idea.

14        Q.    Okay.  And so you don't recall if you looked

15   at this or read this?

16        A.    Do not.

17        Q.    Okay.  Do you recall if you ever received it?

18        A.    Do not.

19        Q.    Okay.

20              (Deposition Exhibit 6 marked.)

21              THE REPORTER:  Exhibit 6.

22              (Document tendered.)

23        Q.    (BY MR. HUGHES)  Mrs. Sideman, this is No. 6.

24   If you could look at the first page, and I know it's

25   turned sideways, could you read to me who this is
```

Page 26

Susan Sideman - October 27, 2017

1    addressed to.

2         A.    To Susan and Mark Sideman.

3         Q.    And this is Bates number PL 0019.

4               Would you mind turning to the second

5    page.  Do you recall ever seeing this page before?

6         A.    No, I don't.  Well, earlier this week.

7         Q.    Okay.  And so you've looked at this page

8    earlier this week, but do you recall ever looking at

9    it before then?

10        A.    I do not.

11        Q.    Okay.  Can you read the top right corner in

12   bold again for me.

13        A.    "DECLARATIONS, Homeowners, Replaces all prior

14   Declarations, if any."

15        Q.    Okay.  And can you read the policy period,

16   which is the first small box near the top.

17        A.    From 7/27/13 to 7/27/14.

18        Q.    Okay.  And can you read the title of the

19   policy, the very top line.

20        A.    The title.  "Farmers Next Generation

21   Homeowners Policy."

22        Q.    And so you have no recollection of whether

23   you received this --

24        A.    Absolutely none.

25        Q.    -- in 2013 or not?

Susan Sideman - October 27, 2017

1              MR. LONGLEY:  Wait until he finishes his

2    question.

3              THE WITNESS:  Sorry.  Okay.  No.

4    Q.  (BY MR. HUGHES)  Could you look at the box in

5    the middle of the page that has a little title above

6    it that says "Endorsements," and could you read for me

7    the last of the four entries there starting with the

8    endorsement number.

9    A.  "TX184, 1ED, Exclusion Of Marring Of Metal

10    Roof Materials."

11    Q.  And before last week, did you ever read that

12    line you just read before?

13    A.  I did not.

14    Q.  Okay.  Mrs. Sideman, would you mind turning

15    to page PL 0043.

16           Do you recall ever seeing this page

17    before?

18    A.  I've never seen this page before.

19    Q.  Okay.  And could you read the title at the

20    top of the page.

21    A.  "Exclusion Of Marring Of Metal Roof

22    Materials."

23    Q.  Okay.  And would you mind reading the number

24    in the top right-hand corner.

25    A.  "TX184, Texas 1st Edition."

Page 28

 1       Q.    Okay.  Do you recall ever receiving this

 2   letter?

 3       A.    No.

 4       Q.    Have you ever seen this letter before today?

 5       A.    No.

 6       Q.    Okay.  Would you mind looking at the second

 7   page of this letter, which is PL 0023, and would you

 8   mind reading for me the second-to-last sentence there

 9   right at the end.  It's starts with "If you."

10       A.    "If you have any questions, please contact

11   your Farmers agent listed on the Declarations page of

12   your policy.  Your agent will be happy to review" the

13   "policy and coverages with you."

14       Q.    And did you ever read that sentence before

15   today?

16       A.    No.

17       Q.    Okay.  Would you mind turning to page

18   PL 0026, and would you mind just briefly reading again

19   the date and who this is addressed to.  I'll try to

20   make this quick.

21       A.    6/4/2013.  Susan and Mark Sideman.

22       Q.    Okay.  Do you recall ever seeing this letter

23   before?

24       A.    No.

25       Q.    And who is this letter from?  There's a name

```
 1        A.    No.

 2        Q.    Okay.  Did you have any contact with

 3   Mr. Woods about the house in 2014?

 4        A.    No.

 5        Q.    Okay.  Any contact with Mr. Woods about the

 6   house in 2015?

 7        A.    No.

 8        Q.    Okay.  And prior to the unfortunate

 9   hailstorm, did you have any contact with Mr. Woods

10   about the house in 2016?

11        A.    No.

12        Q.    Bear with me.  I have to ask these questions.

13   I know they're a bit tedious.

14              Would you mind turning to page PL 0037

15   in this document.

16              MR. LONGLEY:  What's that again, James?

17   Excuse me.

18              MR. HUGHES:  That's 0037.

19        Q.    (BY MR. HUGHES)  And would you mind reading

20   the title of this page, please.

21        A.    "Important Customer Notice" from "the Farmers

22   Next Generation Homeowners Policy."

23        Q.    Okay.  Do you recall ever reading this page

24   or seeing this page before today?

25        A.    No.
```

1    Q.   Okay.  And could you read to me the first

2  sentence of the third paragraph, and it's that largest

3  paragraph right there in the middle.

4    A.   "You are encouraged to and should take the

5  time to review the terms and conditions of the Next

6  Generation policy."

7    Q.   Okay.  And you -- have you ever read that

8  sentence before today?

9    A.   No.

10    Q.   Okay.  Thanks.  Let me turn to the next page,

11  and that's PL 0038.  Would you mind reading to me the

12  header at the top of this page.

13    A.   "Summary Policy Comparison, Texas Family Home

14  Policy and" Texas "Next Generation Homeowners Policy."

15    Q.   Okay.  Would you mind reading for me the last

16  two sentences, and the first one I'm asking you to

17  read starts at the very end of the third line there

18  with "Please."

19    A.   "Please review the policy and endorsements

20  for details.  The policy contract takes precedence

21  over this summary comparison."

22    Q.   And have you ever read those two sentences

23  before today?

24    A.   No.

25    Q.   Have you ever seen this document before

Page 33

1    today?

2         A.   No.

3         Q.   Okay.  For a moment I'd like to turn back to

4    page PL 0043 one more time, and again so the record is

5    clear what's the title of this document?

6         A.   "Exclusion Of Marring Of Metal Roof

7    Materials."

8         Q.   Okay.  And I'm sorry I have to ask, but I

9    have to ask.

10                   Do you understand what "marring of metal

11   roof materials" means?

12        A.   I have no idea.

13        Q.   Okay.  A metal roof -- you understand what a

14   metal roof is, right?

15        A.   Yes.

16        Q.   Okay.  And "marring" -- do you understand

17   what "marring" means?

18        A.   Marking.

19        Q.   And if you don't mind, just -- I hate to ask

20   you to be Merriam-Webster's, but if you don't mind

21   just tell me what you understand "marring" to mean.

22   If you had to explain it to a six-year-old, what does

23   it mean?

24        A.   Like a visual mark left on the roof.

25        Q.   So would you agree that's something that

                                          Page 34

```
 1    alters the appearance of what is marred?  If something
 2    is marred, its appearance is altered?
 3         A.    I would say that's true.
 4         Q.    And, again, I'm sorry to ask -- I'm not
 5    trying to be insulting -- but do you know what
 6    "exclusion" means?
 7         A.    I do.
 8         Q.    Okay.  And so what does "exclusion" mean?
 9         A.    It's not going to be covered.
10         Q.    Okay.  So with that in mind, do you
11    understand what "Exclusion Of Marring Of Metal Roof
12    Materials" means?
13         A.    I could put that together, yeah.
14         Q.    Okay.  And it does mean what?
15         A.    That your -- that something just having an
16    appearance of damage will not be covered.
17         Q.    And could you read down to -- you can see
18    there's a number 14 and there's some bold type next to
19    it.  Would you mind reading that for me.
20         A.    "Exceptions to Uninsured types of damage."
21         Q.    And could you read the line right before
22    that.  Right -- excuse me.  Right below that.  I'm
23    very sorry.  Strike that.
24              Read the line right below Line 14 where
25    it starts "However."
```

Page 35

1        Q.   Okay.

2                MR. LONGLEY:  Are you going to start a

3    new document right now?  We've been going an hour.  I

4    just wanted to see if you needed a break for any

5    reason.  Are you okay?

6                THE WITNESS:  I'm good.

7                MR. LONGLEY:  Okay.

8                MR. HUGHES:  I'm actually getting there,

9    but by all means if you need a break, let me know.

10               THE WITNESS:  I will let you know.

11               MR. HUGHES:  Okay.

12               THE WITNESS:  Thank you.

13               MR. LONGLEY:  Thanks.

14       Q.   (BY MR. HUGHES)  All right.  Mrs. Sideman,

15   I've asked you previously about whether you contacted

16   Mr. Woods about your house, and I believe we went

17   through 2013 until 2016 prior to the hail damage, and

18   you can't recall contacting Michael Woods about the

19   house in that timeframe?

20       A.   Correct.

21       Q.   Okay.  And to be clear, did you contact any

22   other Farmers employee or agent or anyone else about

23   your home insurance during that timeframe?

24       A.   I did not.

25       Q.   Okay.  Prior to 2013 -- and I'm trying to

                                              Page 39

Susan Sideman - October 27, 2017

```
 1    avoid making you go back year by year by year -- can
 2    you recall ever contacting Michael Woods about the
 3    insurance on the house?
 4         A.    No.
 5         Q.    Okay.  How did you -- how did you first
 6    insure the house with Farmers?
 7         A.    I insured it through Michael Woods.
 8         Q.    Okay.  And how did you contact him when you
 9    did that?
10         A.    I phoned him.
11         Q.    Okay.  And do you recall, as best you can,
12    what you told him or asked him to cover?
13         A.    He came out to the house.
14         Q.    Okay.
15         A.    To cover the entire house.  Insure our house
16    the way you insure a house.
17         Q.    Okay.
18         A.    Roof, flooding, any of that stuff.
19         Q.    Okay.  And as best you can recall, what
20    exactly did you tell him, if you can recall?
21         A.    I just told him to write a policy that would
22    cover my house effectively.
23         Q.    Okay.  And did he give you -- did you guys
24    talk about the roof specifically at that time?
25         A.    I'm not one to go into detail.  He's the
```

Page 40

```
 1    expert --
 2        Q.   Sure.
 3        A.   -- he has our best interest in mind, and I
 4    just expected him to do his job.
 5        Q.   Okay.  And to be clear, before -- before the
 6    hailstorm in April 2016, did you ever talk to
 7    Michael Woods specifically about the roof, about
 8    coverage for the roof?
 9        A.   I called him in 2010 when we put the new roof
10    on to let him know that we have put a new roof on our
11    house.
12        Q.   Okay.
13        A.   That was it.
14        Q.   Okay.  Did you tell him anything else at that
15    time?
16        A.   Just that it was a metal roof.
17        Q.   Okay.  And just for the sake of completeness,
18    in 2010 or at any other time since the metal roof has
19    been on there, have you talked to anyone else at
20    Farmers about the metal roof?
21        A.   No.
22        Q.   Okay.
23                 MR. HUGHES:  Let's take a five-minute
24    break.
25                 MR. LONGLEY:  Sure.
```

Page 41

```
 1                    MR. HUGHES:   10-minute break.   Whatever
 2    you guys need.
 3                    (Recess.)
 4        Q.   (BY MR. HUGHES)  Mrs. Sideman, thanks.  I've
 5    just got a couple more questions and I think we'll be
 6    done with your deposition at least.
 7                    So have you talked to Michael Woods or
 8    any other insurance agent or any other insurance
 9    company or employee about getting a different policy
10    for your house since you filed -- well, since
11    April 11, 2016?
12        A.   I have not.
13        Q.   Okay.  Have you priced other policies for
14    your house since --
15        A.   I have not.
16        Q.   Okay.  And in your household, which of you
17    makes decisions about purchasing insurance?
18        A.   (Indicating.)
19        Q.   My wife does that too.
20                    So you're the one who decides what
21    insurance policy or what insurance to get?
22        A.   Yeah.
23        Q.   Okay.
24                    MR. HUGHES:  I will pass the witness.
25                    MR. LONGLEY:  I think I just have one or
```

Page 42

Susan Sideman - October 27, 2017

```
 1    two.
 2                       EXAMINATION
 3    BY MR. LONGLEY:
 4         Q.   Mrs. Sideman, do you recall ever receiving a
 5    different policy other than the one that you always
 6    had up until the time of the storm?
 7         A.   I do not.
 8         Q.   Have you ever seen a different policy other
 9    than the one that you purchased and that you thought
10    you had at the time of the storm?
11         A.   I did -- I have not ever seen another policy.
12         Q.   Okay.  So as far as you knew, at the time of
13    the damage, you had the same policy that you had
14    always had for 20-something years through Michael
15    Woods, is that correct?
16         A.   That is correct.
17         Q.   Okay.
18              MR. LONGLEY:  No questions.
19              MR. HUGHES:  Okay.  And I've got nothing
20    further.  Thanks.
21                    (Deposition concluded.)
22
23
24
25
```

Page  43